CONCRETE MACHINERY COMPANY, INC., Plaintiff, Appellant,

v.

CLASSIC LAWN ORNAMENTS, INC., et al., Defendants, Appellees.

No. 87–1491.

United States Court of Appeals, First Circuit.

Heard Oct. 9, 1987.

Decided April 5, 1988.

James D. Myers with whom Dickson M. Lupo, Bell, Seltzer, Park & Gibson, Charlotte, N.C., James F. O'Brien, William A. Horne and Goulston & Storrs, Boston, Mass., were on brief, for plaintiff, appellant.

Alan B. Almeida with whom Connor & Hilliard, P.C., Walpole, Mass., was on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

This is an appeal from the denial of a motion for a preliminary injunction in an action for copyright infringement. We find that the denial was based on an incorrect analysis of appellant's likelihood of success

on the merits of its claim and remand for reconsideration.

## I

Appellant Concrete Machinery Company, Inc. (Concrete) manufactures and sells molds to make concrete statues and ornamental articles, such as swans, donkeys, deer, and urns, used primarily for lawn decorations. Many of these designs are to some extent original works for which appellant has secured registered copyrights. The validity of these copyrights is not questioned in this action.

Appellee Classic Lawn Ornaments, Inc. (Classic) manufactures and sells concrete lawn statues and ornaments.[1] It avers that it makes no molds and that all its products are manufactured from molds which it purchases elsewhere. Nonetheless, Concrete claims that Classic has copied Concrete's designs, or abetted such activity, and sold those copies without its authorization.

On April 23, 1987, Concrete filed its complaint alleging copyright infringement and unfair competition. It also sought impoundment and temporary restraining orders. Seven of its designs were the subject of those initial filings. They were the No. 212 Senior Swan (Swan), the No. 345 Donkey, the No. R–350 Life Size Deer, the No. 353–R Standing North Woods Fawn (Standing Fawn), the No. 355–R Reclining North Woods Fawn (Reclining Fawn), the No. 357–R Medium Size Standing White Tail Deer (Medium Deer), and the No. 447½ Lady Grecian. In support of its allegations, Concrete submitted the following evidence: photographs and proof of copyright registration of the seven items; its current catalogue, also showing pictures of most of the items; pictures of the alleged offending copies, photographed at Classic's place of business; and affidavits by Vernon Flowers, president of Concrete, and James Edwards, an investigator occasionally employed by Concrete to look into potential copyright infringement of Concrete's designs. In their affidavits, Flowers and Edwards described how bogus molds are created from Concrete's products and explained how they identify the illegal copies made from these bogus molds. Flowers further stated that he had used this method of identification to discover and successfully prosecute, over a twenty-two year period, nine other incidents of infringement of Concrete's copyrighted designs. He then averred that, because of customer complaints, he visited Classic's place of business on February 27, 1987 and found numerous works which appeared to be identical to products made with Concrete's molds. He further swore that he returned to Classic on April 21 with Edwards and specifically identified fourteen Classic products which were created with bogus molds and were unauthorized copies of Concrete's copyrighted designs. Seven of the designs discussed in the Flowers affidavit were the products that were the subject of Concrete's original complaint. The other seven were items, he stated, not included in the complaint because he could not obtain copies of their copyright registration in time to submit with the complaint, filed the day after the affidavit was taken.

The district court issued an order for impoundment and temporary restraining order on the same day the complaint was filed. The order was based solely on the evidence submitted by Concrete. It enjoined Classic from any acts of copyright infringement of Concrete's designs and directed the United States Marshal to impound by segregation or designation any existing illegal copies in Classic's possession. The court issued the order upon a finding that Concrete had made a prima facie showing that it would succeed on the merits of its action and would be irreparably harmed without the order.

Four days later, Concrete filed its first amended complaint. That complaint included six of the seven items not identified in the original complaint but discussed in the Flowers affidavit. These six additional de-

---

1. Defendants-appellees Louis and Anthony Almeida are the owner and manager, respectively, of the corporate defendant. The defendants are collectively referred to in this opinion as "Classic," unless otherwise designated.

signs were the No. 259–B Grotto, the No. 385 Cavalier, the No. 529–C Baby Rustic, the No. 120 Giant Sea Shell Bowl, the No. 347 Pedro Jr., and the No. 113–A Clamshell Bowl. Photographs and proof of copyright registration of all thirteen items were submitted in support of the complaint. It is not clear from the record whether, at this time, Concrete submitted photographs of the Classic products which allegedly infringed the six designs added to the complaint; however, Classic has not denied Concrete's assertion that such evidence was before the court at the time of the preliminary injunction hearing.

In its defense, Classic submitted photographs of its products and affidavits by its president and its manager, co-defendants Louis and Anthony Almeida. This evidence was submitted the day before the hearing on the motion for preliminary injunction. The Almeidas averred that there were "significant and substantial differences" between Classic's products and the copyrighted designs of Concrete. The identified differences referred to only six of the seven designs which were the subject of the original complaint. No distinctions were made regarding Concrete's Medium Deer or any of the six designs added by the first amended complaint, whose filing preceded the affidavits by one week. The defendants did claim that Classic had not infringed rights in two of these later named designs, the Cavalier (lawn jockey) and the Pedro Jr., because its copies allegedly were made with molds purchased from Concrete by the former owners of Classic.

In their affidavits, the defendants claimed only the following distinctions and did not imply there were any others: *Life Size Deer.* First, the defendants both claimed that "Classic's life size deer mold does not contain a separate mold piece for the tail as does Plaintiffs (sic) and Classic's mold has consistently had the deer's tail

pointing downward." Neither affidavit indicated the relevancy of the "separate mold piece" observation; nor did they note that Concrete's life size deer also has its tail pointing downward, as shown in the pictures of the deer submitted with the original and first amended complaints. The Almeidas also averred that Classic's deer had different shaped legs and chest from Concrete's deer. In support, they referred to the plaintiff's catalogue. The defendants overlooked the fact, however, that the deer pictured in the catalogue was design No. 349, not No. R–350 which was the subject of the complaint and whose picture was appended thereto. Therefore, the only true distinction identified by the defendants was that Classic's deer was two and one-half inches shorter and two inches narrower than Concrete's.

*Standing Fawn.* The Almeida affidavits stated that Classic's fawn is twenty-six inches high compared to Concrete's twenty-three inch fawn; that Classic's fawn had a base and antlers whereas Concrete's did not; and that Classic's fawn faced left while Concrete's faced straight ahead. Again, in support, they referred to the plaintiff's catalogue. The catalogue shows that the head of Concrete's No. 353–R fawn actually faces right, not straight ahead. Adjacent to the picture of the No. 353–R fawn in the catalogue is a picture of Concrete's No. 354–L fawn. While not named in either the original or first amended complaint, this latter fawn is identical to the No. 353–R except that its head faces left rather than right.[2]

*Reclining Fawn.* Referring again to the plaintiff's catalogue, the Almeidas averred that Classic's fawns are "smaller in dimension" and have heads which face in "significantly different directions" than Concrete's fawns. The catalogue shows that the No. 355–R fawn faces to the right. Adjacent to

**2.** Plaintiff amended its complaint once again after the hearing. This second amended complaint included the No. 354–L. Since that complaint was not before the district court when it considered Concrete's motion for a preliminary injunction, any evidence or claims in that complaint cannot effect our analysis of whether the court erred when it denied the motion. We

may, however, consider any evidence provided by the catalogues which were before the court at the time of the hearing. The fact that a claimed distinction is shown in the plaintiff's catalogue to be merely a copyrighted variation of the allegedly infringed design may reflect upon the significance and persuasiveness of the distinction.

the picture of the No. 355–R in the catalogue is the left facing No. 356–L fawn, also not named in the original or first amended complaint.[3] These fawns appear in the catalogue to be virtually identical except for the direction of their heads.

*Lady Grecian.* The Almeidas noted that the base of Classic's grecian is plain while Concrete's is decorated. They also swore that Classic's is one inch shorter in height and three-eighths of an inch smaller in width.

*Swan.* The only distinction claimed by both affiants was that Classic's swan is "somewhat smaller" than Concrete's swan.

*Donkey.* The Almeidas pointed out that, unlike Concrete's donkey, their company's donkey had a "distinctive blanket/harness around its middle."

The Almeidas did not claim there were any other differences between Classic's allegedly infringing products and the thirteen designs named in the first amended complaint, filed one week prior to the execution of their affidavits. They did, however, aver that "[m]olds and statues identical to items on which Plaintiff claims a copyright are available from other well-known manufacturers around the country." They attached copies of catalogues from other manufacturers to support this claim.

The Almeidas also addressed the issue of potential harm Classic could suffer were the preliminary injunction granted. Without referring to any data, they both simply claimed that "Classic will in all likelihood, face severe economic hardships and may be required to cease doing business and terminate its employees."

The hearing on the preliminary injunction, held the day after the Almeida affidavits were filed, was brief.[4] The hearing consisted primarily of arguments by counsel for the opposing sides, each emphasizing his version of the facts and law. Aside from additional copies of photographs already submitted with the defendants' affidavits, no new evidence or testimony regarding similarity of products was presented to the court.

Before the day of the hearing was over, the court had issued its ruling denying the plaintiff's motion for a preliminary injunction. The court found that the plaintiff did not have a likelihood of success on the merits of its claim. Without articulating a test for copyright infringement, the court specified three reasons for this conclusion: (1) the defendants' and plaintiff's works were different sizes; (2) there were other "dissimilarities of importance," exemplified only by the fact that the head of the defendants' deer points in a different direction than the head of the plaintiff's deer; and (3) there were similarities between the plaintiff's works and those of other manufacturers of concrete products. The court also noted that the harm the defendants would suffer from the injunction would be greater than the harm suffered by the plaintiff without it, and, coupling this with "the doubts of the court concerning plaintiff's likelihood of prevailing on the merits," denied the injunction.

We will first discuss the standards which the district court should apply to assess the appellant's likelihood of success on the merits of its claim. We will then show how this assessment should be considered with other pertinent factors to determine whether to issue a preliminary injunction.

## II

■ A party must show two elements to prevail on a claim of copyright infringement: (1) ownership of a valid copyright and (2) copying of the protected work by the alleged infringer. *See* 3 M. Nimmer, *The Law of Copyright* § 13.01 at 13–3 (1987) ("Nimmer"). Appellant's ownership and the validity of its copyright is not contested for purposes of its motion for preliminary injunction. Therefore, Concrete's likelihood of success depends upon its ability to prove that Classic has copied its copyrighted designs.

---

**3.** The No. 356–L also was included in the second amended complaint.

**4.** The record of the hearing occupies less than nineteen pages of transcript.

Proof by direct evidence of copying is generally not possible since the actual act of copying is rarely witnessed or recorded. Normally, there is no physical proof of copying other than the offending object itself. Copying therefore is generally established by showing that the defendant had access to the copyrighted work and that the offending and copyrighted articles are "substantially similar." *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982); *O'Neill v. Dell Publishing Co., Inc.*, 630 F.2d 685, 686 (1st Cir.1980). It is not disputed that Classic had access to Concrete's works. Thus, in addition to whatever other physical evidence of copying is produced,[5] appellant's ability to show a likelihood of success on its claim will depend on whether it can demonstrate that the defendants' works are substantially similar to Concrete's protected designs.[6]

Substantial similarity is an elusive concept, not subject to precise definition. It refers only to the expression of the artist's concept, not the underlying idea itself; mere identity of ideas expressed by two works is not *substantial* similarity giving rise to an infringement action. 17 U.S.C. § 102(b); *Atari*, 672 F.2d at 615. Ideas cannot be copyrighted. *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985). An artist "can claim to 'own' only an original manner of expressing ideas," not the ideas themselves. *Cooling Systems and Flexibles v. Stuart Radiator*, 777 F.2d 485, 491 (9th Cir.1985). It necessarily follows, then, that appellant cannot succeed with an infringement action simply because appellee has also produced concrete statues of deer, swans, or donkeys. *See Mazer v. Stein*, 347 U.S. 201, 218, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954). Rather, absent other physical evidence of copying, Concrete must demonstrate that Classic's works are substantially similar to Concrete's original *expression* of these concepts.

Some ideas admit of only a limited number of expressions. When there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression. *See, e.g., Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738 (9th Cir.1971) (idea and expression of copyrighted "jeweled bee pin" inseparable and thus copying not prohibited); *Morrissey v. Proctor & Gamble Co.*, 379 F.2d 675 (1st Cir.1967) (since few ways to express rules for "sweepstakes," no infringement although defendant's rules only slightly different from plaintiff's rules).[7] When the idea and its expression are not completely inseparable, there may still be only a limited number of ways of expressing the idea. In such a case, the burden of proof is heavy on the plaintiff who may have to show "near identity" between the works at issue. *Sid & Marty Krofft Television v.*

---

**5.** In its affidavit and at the hearing below, appellant produced some physical evidence of copying, other than similarity between works which, it argued extensively, showed that the allegedly infringing items were made from bogus molds directly created from its copyrighted products. The argument relied partly on the slight differences in size between the products of Concrete and Classic: Concrete argued that Classic's rubber molds, unlike Concrete's metal molds, were subject to shrinkage. The rubber molds, it claimed, were made by allowing liquid rubber to harden around a Concrete design. The defendants argued the physical evidence showed no such physical appropriation.

**6.** Although access plus substantial similarity generally is required to show copying, the trier of fact may nonetheless find no copying if the defendant shows independent creation. *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 501 (2d Cir.1982); *Franklin Mint Corp. v. Nat'l Wildlife Art Exchange, Inc.*, 575 F.2d 62, 66 (3d Cir.1978); *Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 n. 3 (2d Cir.1977).

**7.** The rationale for this rule, as Judge Aldrich stated, is that "to permit copyrighting [in that case] would mean that a party or parties, by copyrighting a mere handful of forms [of expression], could exhaust all possibilities of future use of the substance ... [and thus] the subject matter would be appropriated by permitting the copyrighting of its expression. We cannot recognize copyright as a game of chess in which the public can be checkmated." *Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678–79 (1st Cir.1967).

*McDonald's Corp.*, 562 F.2d 1157, 1167 (9th Cir.1977). This showing is necessary because, as idea and expression merge, fewer and fewer aspects of a work embody a unique and creative expression of the idea; a copyright holder must then prove substantial similarity to those few aspects of the work that are expression not *required* by the idea. *See Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 908 (3d Cir.) (test of appropriation "necessarily varies" with amount of creativity in copyrighted work), *cert. denied*, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975). "[S]imilarity that inevitably stems solely from the commonality of the subject matter is not proof of unlawful copying." *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 913 (2d Cir.1980). This principle, however, does not foreclose the possibility that a painstakingly detailed reproduction of an object in the public domain may receive copyright protection. *See* the seminal case of *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99 (2d Cir.1951) where the court upheld copyrights in mezzotint reproductions of old, classic paintings. In this latter situation, the issue is not so much merger of idea and expression, but proof of copying; the alleged infringer easily can defend by showing he copied the work in the public domain and not the copyrighted reproduction.

As an example in the case before us, appellant has a copyright in a design of concrete "life size deer." The idea behind this particular expression can be briefly described as a "realistic-looking concrete deer." Appellant cannot prohibit others from appropriating this idea; it can, however, prohibit any actual copying of its own version of a "realistic-looking concrete deer." Yet, it has a problem of proof: because the statue is a detailed replica of a real deer, the deer, in essence, supplied most of the features which any subsequent artist can also take from the real deer. To prove copying, then, Concrete must show *substantial* similarity, between works, in those features over which it exercised discretion while portraying a "realistic-looking concrete deer." These features include

such aspects as pose, posture, and facial expression.

■ Conversely, of course, "as a work embodies more in the way of particularized expression, it moves further away from [merger of idea and expression] and receives broader copyright protection." *Atari*, 672 F.2d at 617. *See also Sid & Marty Krofft Television*, 562 F.2d at 1168. This broader protection is available in the typical case of an original work embodying only one of an infinite variety of ways of expressing an idea. At this end of the spectrum, "[d]uplication or near identity is not necessary to establish infringement." *Sid & Marty Krofft Television*, 562 F.2d at 1167; *see also Atari*, 672 F.2d at 618. Many of Concrete's works appear to be nearer to this end of what could be described as a sliding-scale of copyright protection.

■ Under traditional analysis, whether there is substantial similarity between copyrightable expressions is determined by the "ordinary observer" test. *See, e.g., Walker v. Time Life Films, Inc.*, 784 F.2d 44, 51 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *O'Neill*, 630 F.2d at 687. "The test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Educational Testing Services v. Katzman*, 793 F.2d 533, 541 (3d Cir.1986) (quoting *Atari, Inc.*, 672 F.2d at 614). In the words of Judge Learned Hand, two works are substantially similar if "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960); *see also Ideal Toy Corporation v. Fab–Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966) (test stated as "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work").

Slight or trivial variations between works will not preclude a finding of infringement under the ordinary observer test. *Atari*, 672 F.2d at 618. *Durham Industries, Inc.*, 630 F.2d at 913. "The *sine qua non* of the ordinary observer test ... is the overall similarities rather than the minute differences between the two works." *Atari*, 672 F.2d at 618; *see also Novelty Textile Mills*, 558 F.2d 1090, 1093 (2d Cir.1977) ("the copying need not be of every detail so long as the copy is substantially similar to the copyrighted work") (quoting *Comptone Co. v. Rayex Corp.*, 251 F.2d 487, 488 (2d Cir.1958)). At times, the existence of only minor differences may itself suggest copying, indicating that the infringer attempted to avoid liability by contributing only trivial variations. *See Atari*, 672 F.2d at 619 ("superficial changes ... may be viewed as an attempt to disguise an intentional appropriation"); *Tennessee Fabricating Co. v. Moultrie Manufacturing Co.*, 421 F.2d 279, 284 (5th Cir.) (infringement "includes colorable alterations made to disguise piracy"), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1819, 26 L.Ed.2d 91 (1970). This is not to suggest that an artist cannot avoid infringement by intentionally making substantial alterations in the design of a copyrighted work so as to provide a substantially different expression of the idea embodied in the copyrighted work. *Eden Toys Inc. v. Marshall Field & Co.*, 675 F.2d 498, 501 (2d Cir. 1982). Yet, it is only when "the points of dissimilarity not only exceed the points of similarity, but indicate that the remaining points of similarity are (within the context of plaintiff's work) of minimal importance either quantitatively or qualitatively, [that] no infringement results." 3 Nimmer § 13.03[B], at 13–43.

The ordinary observer test was incorporated by the Second Circuit, in *Arnstein v. Porter*, 154 F.2d 464 (2d Cir.1946), as the second step in a two part test for copyright infringement. Pursuant to that test, the court first must determine whether there has been "copying." *Id.* at 468. This step involves "dissection" of the work, perhaps aided by expert testimony, to assess whether there are sufficient articulable similarities to justify a finding that the defendant has copied from the protected work. *Id.* Second, once "copying" is established, the court must determine whether the copying is sufficiently substantial to constitute "unlawful appropriation" ("illicit copying"). *Id.* That is, copying only trivial aspects of another's work will not result in *substantial* similarity; it is only when the copying is sufficiently extensive that infringement occurs. Under this second step of the analysis, therefore, the trier of fact applies the "ordinary observer" test, unaided by dissection or expert testimony, to determine whether the copying resulted in substantial similarity between the works. *Id. See also Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Universal Athletic Sales Co.*, 511 F.2d at 907.

This test provides a workable, flexible framework for copyright infringement analysis. The first step of the analysis accomplishes at least two important goals. As a preliminary matter, the court can "dissect" the copyrighted work to identify those aspects of the expression that are not necessarily mandated by the idea it embodies. *See Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.) (discussing the "difficult task [of] distill[ing] the nonprotected idea from protected expression"), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). At this point, the court can "focus on whether [and to what extent] the idea is capable of various modes of expression." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1253 (3d Cir.1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). By dissecting the accused work and identifying those features which are protected in the copyrighted work, the court may be able to determine as a matter of law whether or not the former has copied protected aspects of the latter.[8] The court can also determine, in at

---

**8.** As an example of where dissection was improperly used, *see Apple Barrel Productions Inc.*

least a general way, those aspects of the work that are protected by the copyright and that should be considered in the subsequent comparative analysis under the ordinary observer test.[9] Assuming copying of protected aspects is established, the trier of fact can then assess pursuant to the "ordinary observer" test whether there is substantial similarity between the protected expression and the accused work.

### III

At the hearing below, the court did not identify those aspects of appellant's works that are protected expression. Furthermore, it did not discuss whether the works and the ideas they embody are inseparable. Our own review of the evidence which was before the district court leads us to conclude that the works likely embody ideas subject to diverse expression. The Lady Grecian, the Grotto, The Baby Rustic, the Giant Sea Shell Bowl, and the Clamshell Bowl each seem to contain a considerable amount of detail, representing one of several ways of expressing each underlying concept. Similarly, the Cavalier and the Pedro Jr. are each a single form of the virtually limitless ways these stereotypes can be expressed. In such a case, trivial or minor variations between the accused work and the copyrighted work will not avoid a finding of infringement. *Atari,* 672 F.2d at 618; *Sid & Marty Krofft Television,* 562 F.2d at 1167. Even the various animal representations, while lifelike and allowing of fewer possibilities, are nonetheless somewhat stylized versions of these creatures in terms of posture and facial expression.

The court specifically identified only two differences between appellant's and appellees' works. First, it found that the two sets of works were of different sizes and

correctly noted that this would not necessarily mean that appellees' works are not infringements. It then found "dissimilarities of importance." The only example given of these important dissimilarities was that the head of appellees' deer points in a different direction than the head of appellant's deer. Concrete had claimed copyright violation of its No. 353–R Standing Fawn, No. 355–R Reclining Fawn, and No. 357–R Medium deer. The heads of these figures point to the right. It also owned copyright in its virtually identical but left facing No. 354–L Standing Fawn, No. 356–L Reclining Fawn, and No. 358–L Medium Deer. These had not been named in its complaint at the time of the hearing and thus could not be the basis of the court's decision at that time.[10] However, both the left and right facing deer and fawns were pictured, with copyright notice, adjacent to each other on the same page of Concrete's catalogue, submitted to the court before the hearing and referred to in the defendants' affidavits. We fail to perceive much persuasive value in a trivial distinction claimed by the defendant which is portrayed in the evidence as another copyrighted design of the plaintiff. Even if the deer had not been portrayed in the catalogue in both its left and right facing positions, Classic could not avoid a finding of substantial similarity merely by showing the head of its deer points in a different direction. Aside from slight variations in size of its Life Size Deer and Standing Fawn, no other valid distinctions were claimed by Classic regarding its cervine creatures.[11]

Classic identified few other differences between Concrete's products and its own. It showed that the base of its Lady Grecian was plain whereas Concrete's design included a highly decorated foundation. It

*v. Beard,* 730 F.2d 384, 387–88 (5th Cir.1984) (holding district court erroneously failed to consider copyrighted show as a whole).

9. For example, the court may find that the idea and expression are so inseparable that copying of the work is not prohibited or that only exact reproduction of the work will justify a finding of infringement.

10. Concrete's second amended complaint named these three additional designs. *See, ante,* note 2.

11. As discussed *ante,* other distinctions alleged by Classic regarding its Life Size Deer were presented by comparing its product with a Concrete design which was not the allegedly infringed work.

also claimed its version was one inch shorter in height and three-eighths of an inch smaller in width. The only distinction claimed between the swans of the two companies was size. No distinctions whatever were even claimed regarding six of the seven remaining items listed in Concrete's first amended complaint. Except for the Donkey, we could perceive no other differences in the evidence that was before the court regarding any of these items that were allegedly copied. Since these works do not represent a merger of idea and expression, the minor distinctions identified by either Classic or the court are not sufficient to avoid a finding of substantial similarity. *Cf. Atari*, 672 F.2d at 618 (likelihood of success despite "laundry list" of minor differences identified by defendant); *Tennessee Fabricating Co.*, 421 F.2d at 284 ("no doubt" that defendant does not avoid infringement by adding additional straight lines to plaintiff's filigree pattern for metal casting); *Novelty Textile Mills*, 558 F.2d at 1094 n. 6 ("mere changes in the color scheme on the copied design would ordinarily not protect the defendant from a claim of infringement"). Our review of the evidence does lead us to conclude, however, that the district court would not have abused its discretion in finding that Classic's donkey was not likely to be found to be substantially similar to Concrete's design of this figure.

The court also doubted appellant's ability to succeed because there were similarities between plaintiff's protected works and those of other manufacturers. The rationale apparently was based on the depictions of concrete statues in catalogues submitted by Classic from other manufacturers of molds and statues. This evidence, however, was misused and was wholly irrelevant to the claim or the defense as it was presented. "[T]he common practice of defendants at trial in pointing out a similar work created in antiquity, or at least prior to the defendant's creation is of no assistance unless the trier of fact believes that the defendant copied such (public domain) works" and not those of the plaintiff. *Novelty Textile Mills*, 558 F.2d at 1093 n. 3. The catalogues from other

manufacturers would have been relevant if the defendant used them to identify the source of its molds. Indeed, we do not understand why the defendant failed to use this most obvious defense. It claimed that its allegedly infringing copies were made from molds legally purchased from other manufacturers. It submitted catalogues of other manufacturers to the court. Presumably, among those catalogues were the catalogues of the manufacturers from whom they bought their molds. Using these catalogues, Classic simply could have shown the court where it had obtained its mold for each challenged design. The court then could have preliminarily determined whether the defendant's products were made from those specific molds sold by another manufacturer. Instead, however, the catalogues were used to improperly infer that, because other manufacturers generally sold molds and statues similar to Concrete's copyrighted designs, those designs were not protected from infringement by Classic.

The catalogues also would have been relevant if Classic had been challenging Concrete's copyrights, alleging that the plaintiff's works were merely copies and thus lacking sufficient originality to qualify for copyright. The defendant, however, did not make this challenge.

We therefore hold that the district court applied an incorrect standard of law to assess the likelihood of appellant's success on the merits of its copyright claim. Given this error, and the scanty factual findings made by the court, we cannot uphold denial of the preliminary injunction. We do not foreclose the possibility, however, that upon reconsideration of the evidence in light of the correct standard, the court still could conclude that Concrete is not likely to succeed on the merits of its claim. In short, we express no opinion upon the probable outcome of a properly-conducted preliminary injunction hearing.

Upon reconsideration, the court need not consider the likelihood that the defendant will not be able to demonstrate that the plaintiff's works represent such a merger of idea and expression that copying of the

works is permitted. Our own review of the evidence coupled with the district court's finding "that the figures of the plaintiff are copyrightable and copyrighted" lead us to conclude that the court correctly, albeit implicitly, found that no such merger is apparent. However, on rehearing, the court should "dissect" the works to identify those aspects which Concrete likely will be able to show are protected expression and were copied by Classic. Then, focusing on those aspects which are protected expression, the court should determine whether Concrete is likely to prove, under the ordinary observer test, that Classic's works are substantially similar to its own. To avoid a finding of likelihood of success on the merits for Concrete, Classic will have to identify more significant differences than slight variations in size or a different positioning of a statue's head. Alternatively, of course, Concrete can show that it will likely be able to prove that its statues were created from molds created independently from a non-infringing source.

### IV

■■■ The district court also found that an injunction would cause greater harm to the defendant than the plaintiff would suffer without it. This finding was made pursuant to the four part test traditionally used in this circuit to determine whether a preliminary injunction should issue. This test requires a plaintiff to prove each of the following: (1) the plaintiff has a likelihood of success on the merits of his claim; (2) the plaintiff does not have an adequate remedy at law such that it will suffer irreparable harm without the injunction; (3) this harm is greater than the injury the defendant will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Collazo Rivera v. Torres Gaztambide,* 812 F.2d 258, 259 (1st Cir. 1987); *Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). The requirement that the plaintiff must show each element of this test, however, does not imply, at least in a copyright action, that each element should be considered independently of the other three

factors. *See, e.g., United Steelworkers of America, AFL–CIO v. Textron, Inc.,* 836 F.2d 6, 7–8 (1st Cir.1987).

The heightened danger of evaluating each factor independently in copyright actions is at least partly attributable to the fact that copyright protects the unique and somewhat intangible interest of creative expression. Unlike most property rights, the value of this interest is often fleeting. The popular demand for a new literary, musical, sculptural or other "work of authorship," *see* 17 U.S.C. § 102, often may last only until the next fad. Consider, *e.g., Apple Computer, Inc. v. Formula Int'l Inc.,* 725 F.2d 521 (9th Cir.1984) (computer program); *Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607 (7th Cir.) (PAC–MAN videogame), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090 (2d Cir.1977) (fabric design). In such situations, the commercial value of the copyright owner's tangible expression, appropriated by an infringer, may be lost by the time litigation on the claim is complete. Furthermore, monetary recovery at that point may be inadequate to redress the harm. The ultimate commercial success of an "artist" often depends on name recognition and reputation with the value and popularity of each succeeding work depending upon the "name" established through commercial exploitation of preceding works. This can be true whether the "artist" creates musical compositions, video games, or concrete statues. Any ultimate success in a lawsuit could have little effect on public perception of who the true creator was.

■■■ Several general rules regarding application of the four factors of the preliminary injunction test to copyright cases have evolved. First, as the district court correctly noted, irreparable harm is usually presumed if likelihood of success on the copyright claim has been shown. *West Publishing Co. v. Mead Data Central, Inc.,* 799 F.2d 1219, 1229 (8th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714

F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *Atari, Inc.,* 672 F.2d at 620 (7th Cir.1982); *Novelty Textile Mills, Inc.,* 558 F.2d at 1094 (2d Cir.1977).[12] There is, therefore, no need actually to prove irreparable harm when seeking an injunction against copyright infringement. Secondly, the issue of public policy rarely is a genuine issue if the copyright owner has established a likelihood of success: "Since Congress has elected to grant certain exclusive rights to the owner of a copyright, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d at 1255 (3d Cir.1983) (quoting *Klitzner Industries, Inc. v. H.K. James & Co.,* 535 F.Supp. 1249, 1259–60 (E.D.Pa.1982)).

▮ More important to our decision here is the sometimes questionable relevance of the "balance of hardships" factor to the determination of whether a likely infringer should be preliminarily enjoined. Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense "merits little equitable consideration." *Helene Curtis Industries v. Church & Dwight Co., Inc.,* 560 F.2d 1325, 1333 (7th Cir.1977), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). "Advantages built upon a deliberately plagiarized make-up do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed." *Id.* (quoting *My–T Fine Corp. v. Samuels,* 69 F.2d 76, 78 (2d Cir.1934). Such considerations apply even to a business which is exclusively based on an infringing activity and which would be virtually destroyed by a preliminary injunction. It would be incongruous to hold that the more an enterprise relies on copyright infringement for survival, the more likely it will be able to defeat the copyright owner's efforts to have that activity immediately halted. We see little reason why an entity should be allowed to establish and continue an enterprise based solely on what is in all likelihood copyright infringement, simply because that is its only business. The Third Circuit recently recognized this principle in rejecting the denial of a preliminary injunction because of the "devastating effect" the injunction would have on the defendant's business: "If that were the correct standard, then a knowing infringer would be permitted to construct its business around its infringement, a result we cannot condone. The size of the infringer should not be determinative of the copyright holder's ability to get prompt judicial redress." *Apple Computer Inc. v. Franklin Computer Corp.,* 714 F.2d at 1255 (citations omitted).

▮ We believe, then, that a court's findings regarding likelihood of success in a copyright action, as in other actions, *see Textron,* 836 F.2d at 7–8, should be placed in the scales when it weighs the balance of the harms. This approach should prevent the unjust result of allowing an infringer to continue his activities, despite a strong showing of likelihood of success by the plaintiff, simply because the defendant's principal enterprise is infringement. On the other hand, it allows consideration of relative hardships to be a significant, and perhaps determinative, factor when the defendant has shown it may suffer significant harm and the plaintiff has made only a marginal showing of likelihood of success. Although the district court's opinion is not absolutely clear on the point, we assume that it employed this approach in the original hearings, and that it will reassess the balance on remand in light of its new findings. Again, we take no view of the likely outcome of any such balancing.

▮ We therefore hold that the district court should reconsider the balance of

12. Only courts in the Fifth Circuit refuse to presume irreparable harm upon a showing of a likelihood of success on the merits. *See South-* *ern Monorail Co. v. Robbins & Myers,* 666 F.2d 185, 188 (5th Cir.1982).

hardships in this case in light of its reassessment of Concrete's likelihood of success. If a strong likelihood of success is demonstrated, then the court should issue the injunction even if the defendant will incur the relatively greater burden; a probable infringer simply should not be allowed to continue to profit from its continuing illegality at the copyright owner's expense. On the other hand, if Concrete shows only a slightly greater chance of succeeding than failing on the merits, and the balance of hardships otherwise weighs in favor of Classic, the court should not force the defendant to suffer prior to a final determination on the allegations, and no injunction should ensue.

The judgment of the district court denying appellant's motion for a preliminary injunction is vacated and remanded for reconsideration consistent with this opinion.

*Vacated and remanded.*