**ACCUSOFT CORPORATION, Plaintiff,**

v.

**James PALO, Simon Wieczner, and Snowbound Software, Defendants.**

**James PALO, Consolidated Plaintiff,**

v.

**ACCUSOFT CORPORATION and Scott Warner, Consolidated Defendants.**

Civil A. No. 96–40036–NMG.

United States District Court, D. Massachusetts.

May 9, 1996.

Louis M. Ciavarra, George B. Sanders, Jr., David M. Ianelli, Bowditch & Dewey, Worcester, MA, Arthur R. Carmen, Chelmsford, MA, for Accusoft Corporation.

William S. Strong, Kotin, Crabtree & Strong, Boston, MA, for James L. Palo.

Richard C. Heidlage, Heidlage & Reece, Boston, MA, William S. Strong, Kotin, Crabtree & Strong, Boston, MA, for Simon Wieczner.

## MEMORANDUM AND ORDER

GORTON, District Judge.

Pending before this Court is a motion by plaintiff, Accusoft Corporation ("Accusoft"), for a preliminary injunction against defendants James Palo ("Palo"), Simon Wieczner ("Wieczner") and Snowbound Software, and a cross-motion by consolidated plaintiff, Palo, for a preliminary injunction against consolidated defendants Accusoft and Scott Warner. Both motions will be allowed, in part, for the reasons, and to the extent, set forth below.

## I. BACKGROUND

The heart of this dispute involves mutual claims of ownership in a particular computer software "library" by plaintiff in the lead case, Accusoft, and by plaintiff in the consolidated case, Palo. Although the factual background is both complicated and contested, the following is a summary of relevant events for the purpose of determining what, if any, injunctive relief should be granted.

Accusoft is a corporation engaged in the image processing software business. Its president and founder, Scott Warner ("Warner"), claims that sometime in late 1991, he began developing a toolkit product for file format support which would later be known as the Accusoft Image Format Library ("the Library").

Palo is a computer software designer and developer. He claims that in 1990, he began developing an image processing program which he named "Hindsight". According to Palo, Hindsight contained a number of software codes or routines that could enhance, modify and manipulate images.

In January, 1992, Palo was commissioned by Concentric Data Systems ("Concentric") to design and develop a toolkit of routines for the company pursuant to a written "work for hire" agreement. Under that agreement, Palo was to develop a set of codes for the exclusive benefit of Concentric, with the intent that Concentric would own all rights, title and interest in such product. In order to create those Concentric codes, Palo claims that he made a small number of adjustments to his Hindsight program. Palo maintains that, at all times, he retained the copyright to his original Hindsight program.

At about that same time, Warner and Palo, who had met several years earlier while both were working at Polaroid Corporation, began discussions about marketing the Library. The nature and content of those discussions is in dispute. Warner claims that he hired Palo to assist in developing codes for the Library under Warner's direction. Palo, by contrast, alleges that Warner told him that he was looking for a library or toolkit of routines that could enhance, modify and manipulate images. When Palo told Warner that he had been developing such a set of image filter codes, Warner allegedly asked Palo to sell him those codes. Palo was not interested in selling his product outright but was prepared to license it.

On March 26, 1992, Palo and Accusoft executed a one-year contract ("the March 1992 Agreement") in which Palo 1) agreed to "provide a product to be known as AccuSoft Image Format Library" and 2) granted to Accusoft the "exclusive distribution and marketing rights of the [Library]", as well as the right of first refusal to those rights for an additional unspecified period. In consideration, Palo was to receive 1) the lesser of $75 or 25.5% of the list price of each copy of the Library that was sold, and 2) 50% of the gross revenue collected from the sale of each source code. Palo also agreed to pay for one-half of all advertising costs incurred by Accusoft in promoting the Library, to eliminate "bugs" in the Library within a reason-

able time period, and to be available for technical support within four hours of any request therefor. Both parties understood that this exclusive license of distribution and marketing rights would apply to the Library as it existed at the time of the March 1992 Agreement, as well as to any additions and improvements made to the Library thereafter.

The Library was first published on May 15, 1992. Initially, the copyright notice of the Library was in the name of Accusoft, but in later versions, Palo used his own name in the copyright notice.

On February 1, 1993, Palo and Accusoft executed an extension of the March 1992 Agreement ("the Extension"). The Extension incorporated many of the terms of the March 1992 Agreement but contained one notable change regarding its duration. Whereas the March 1992 Agreement specified a one-year termination date, the Extension was to "remain in effect for one (1) year from the date of execution [February 1, 1993] and continue automatically in one (1) year extensions after that period unless otherwise agreed upon by [Accusoft] and [Palo]." Other changes included the granting of a two year right of first refusal to Accusoft after the Extension was terminated and the provision that Palo would be paid 25% of the sale price of each Library sold.

In July, 1993, Accusoft hired Wieczner as an independent contractor to provide sales and marketing assistance with the Library. Wieczner claims that he had previously developed a marketing and customer prospect database which he brought with him to Accusoft. Although he added to that database while working for Accusoft and used it to implement a sales and marketing strategy for the company, Wieczner maintains that at no point did he ever assign the rights to that database to Accusoft.

By December, 1993, sales of the Library reached $120,000 per month. Wieczner and Accusoft executed a new contract under which Wieczner was to continue working as an independent consultant, was named Vice President of Sales and was given a new compensation arrangement. In February, 1994, Wieczner's compensation scheme was altered again and his status was changed from independent consultant to employee for tax-related purposes.

By 1995, Accusoft had gross revenues of $3.2 million dollars. In August of that year, Wieczner and Accusoft executed an Employment Agreement for Technical Employees ("August 1995 Agreement") in which Wieczner agreed not to compete with Accusoft in image processing software development activities for one year after termination of his employment by Accusoft. The August 1995 Agreement also contained a provision that would prevent Wieczner from trying to hire away any of Accusoft's employees for the six month period following his termination. Wieczner now maintains that he signed that Agreement under duress because Accusoft had made it clear that a refusal to sign would result in his termination.

Also in 1995, relations between Warner and Accusoft on the one hand, and Palo and Wieczner on the other hand, (hereinafter referred to as singular, opposing parties) visibly began to deteriorate. Sometime after the execution of the August 1995 Agreement, for example, Accusoft demoted Wieczner to a sales manager position and imposed a retroactive pay cut. Wieczner claims that action was intended to force him to resign, which he did on December 22, 1995. In early January, 1996, Warner informed Palo that he could no longer work on Accusoft's premises. Palo removed all of his office equipment and began working from his home. By letter dated January 19, 1996, Palo gave notice that the Extension Agreement would be terminated as of January 31, 1996.

Palo and Wieczner then formed their own company, Snowbound Software, with the intention of producing a product identical to the Library and selling it as the "RasterMaster Library".

As both sides threatened to sue one another for various and sundry wrongdoings, including copyright infringement, they both registered their copyright to the Library with the United States Copyright Office. Palo registered on January 22, 1996, Accusoft on February 20, 1996.

In March, 1996, after Accusoft discovered that Palo had been under a work for hire agreement with Concentric prior to his work with Accusoft, Accusoft purchased for One Dollar all of Concentric's rights, title and interest in and to the Concentric codes.

## II. PROCEDURAL HISTORY

On March 5, 1996, Accusoft filed a complaint in the United States District Court for the Central Section of the District of Massachusetts against Palo and Wieczner, individually and as Snowbound Software, alleging various counts of breach of contract, conversion of property, misappropriation of proprietary and confidential information, interference with contractual relations, copyright infringement, and unfair trade practices and unfair competition in violation of 15 U.S.C. § 45(a)(1) and M.G.L. c. 93A, § 11.

On that same day, Palo filed a complaint in the United States District Court for the Eastern Section of the District of Massachusetts, naming Accusoft and Warner as defendants and alleging copyright infringement, defamation, misappropriation of trade secrets, conversion of property, breach of contract and violation of M.G.L. c. 93A. The two cases were consolidated into the case before this Court on April 24, 1996.

On March 12, 1996, Accusoft filed a motion for a preliminary injunction in which it asks this Court to enjoin defendants Palo and Wieczner from:

1) infringing upon Accusoft's alleged copyright rights in the Library,

2) copying, selling, marketing, promoting, distributing or otherwise disposing of any copies of the RasterMaster Library,

3) using information contained in Accusoft's prospect and customer order databases or any other confidential files,

4) interfering with those customers who were under existing contracts with Accusoft and those prospective customers who were listed in its confidential databases,

5) representing that they owned or developed the Library, and

6) using the Accusoft trademark.

Accusoft also asks this Court to require defendants a) to return all confidential and proprietary Accusoft databases and files, as well as all copies of the Library and RasterMaster Library and b) to provide plaintiff with a full and complete accounting of all transactions involving the RasterMaster Library. Finally, Accusoft seeks to enjoin defendant Wieczner a) from competing with Accusoft in the image processing software business until December 22, 1996 and b) from trying to hire Accusoft employees until after June 22, 1996 in accordance with the terms of his August 1995 Employment Agreement.[1]

Palo, in turn, has filed his own motion for a preliminary injunction seeking to enjoin Accusoft and Warner from:

1) manufacturing, distributing, selling or promoting the Library,

2) making any public statements that they own the Library or that Palo does not own the Library, and

3) using or disclosing the source codes of the Library.

Palo further requests that Accusoft and Warner be required to return all the source codes and other documentation of the Library.

## III. DISCUSSION

■ In determining whether to grant preliminary injunctive relief, this Court traditionally considers 1) the likelihood of the moving party's success on the merits, 2) the potential for irreparable harm to the moving party if relief is denied, 3) a balancing of the hardships, and 4) the effect on the public interest. *Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221, 1224 (1st Cir.1993), *cert. denied,* ─── U.S. ───, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994).

■ In a case involving claims of copyright infringement, this Court has the au-

---

1. With respect to this request for injunctive relief against defendant Wieczner, this Court finds that Accusoft has neither sufficiently demonstrated a likelihood of success on the merits of this claim nor shown the potential for any irreparable harm that will result from the denial of such relief, particularly in light of the injunctions that are to be imposed herein.

thority to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The standard of review to be applied by the Court is, however, slightly different. Specifically, the moving party need not prove irreparable harm because such harm is presumed if the moving party has otherwise demonstrated a likelihood of success on the merits of its copyright infringement claim. *Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 611–12 (1st Cir.1988). Furthermore, the issue of public policy is rarely a genuine issue if the copyright owner has established a likelihood of success. *Id.* at 612.

█ Therefore, to the extent that either party seeks preliminary injunctive relief from copyright infringement, that party need only show 1) a likelihood of success on the merits, and 2) that a balancing of hardships weighs in its favor. *Id.* If the moving party can show a strong likelihood of success, then this Court may issue an injunction even if the nonmovant will incur the relatively greater burden. On the other hand, if the movant shows only a slightly greater chance of success and the balance of hardships otherwise weighs in favor of the nonmovant, this Court will not issue an injunction that may inflict damages upon the nonmovant before a final resolution of the dispute. *Id.* at 613.

Because this Court believes that its decision on the cross motions for injunctive relief on the copyright infringement claims will dispose of the remaining requests for injunctive relief, at least until a trial on the merits, it now addresses those copyright infringement claims.

A. *Likelihood of success on the merits on the parties' copyright infringement claims*

█ The parties agree that a copyright is involved in this case and that the Copyright Act embodied in 17 U.S.C. §§ 101 *et seq.* applies. In order to determine each party's likelihood of success on the merits of its or his copyright infringement claim, this Court must examine the elements of the particular claim. Specifically, a party alleging copyright infringement must prove 1) ownership of a valid copyright, and 2) unauthorized copying of constituent elements of the work that are original. *Lotus Development Corp. v. Borland Int'l Inc.,* 49 F.3d 807, 813 (1st Cir.1995), *aff'd,* — U.S. —, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996).

It is clear that the opposing parties are attempting to reproduce and sell identical programs. The second element to a copyright infringement action is, therefore, not in dispute. Instead, these copyright infringement claims turn on the issue of ownership of a valid copyright. Both parties, in effect, concede that the Library is copyrightable but each claims to hold the valid copyright. The issue of ownership thus depends on 1) who was the original author of the Library, and 2) what part, if any, of the rights protected by a copyright did that author transfer.

█ After examining the parties' memoranda of law, affidavits and exhibits and considering the extensive oral arguments, this Court concludes that Palo has shown a likelihood of demonstrating that he is the author of at least a substantial portion of the Library. The Court bases that conclusion, in part, upon its belief that the evidence will likely show that Palo:

1) created the programs upon which the Concentric codes were based,

2) retained the copyright to those original programs notwithstanding the work for hire agreement between Palo and Concentric, and

3) used those same programs to produce the initial codes for the Library in 1992.

Based upon the evidence presented thus far, this Court is not persuaded by Accusoft that the codes that Palo provided to it belonged to Concentric. This Court also believes that Palo is likely to show that he is the creator of most of the codes authored while he was working with Accusoft after 1992. Pursuant to 17 U.S.C. § 201(a), the copyright in all of those codes therefore vests initially in Palo.

Had Palo and Accusoft entered into a work for hire agreement in 1992, Accusoft would be considered the author of those codes under 17 U.S.C. § 201(b). Neither the March

1992 Agreement nor the February 1993 Extension were, however, work for hire agreements. A "work made for hire" is defined in 17 U.S.C. § 101 as 1) a work prepared by an employee within the scope of his employment, or 2) a work specially ordered or commissioned for certain uses enumerated in the statute "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." By Accusoft's own admission, Palo was hired as an independent contractor, not an employee. Furthermore, there was no express written agreement that Palo's work for Accusoft would be "work made for hire". Therefore, Accusoft is not and cannot be made the "author" of those codes within the meaning of § 201 of the Copyright Act.

If Palo was the author of a substantial number of the codes in the Library and thus the copyright owner of those codes, he then possessed the following exclusive rights in his copyrighted works under 17 U.S.C. § 106:

1) the right to "reproduce the copyrighted work in copies",

2) the right to "prepare derivative works based upon the copyrighted work", and

3) the right to "distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending."

■ Any of those exclusive rights could have been transferred pursuant to 17 U.S.C. § 201(d). This Court believes that there is a likelihood that the evidence will show that Palo did transfer one of his exclusive rights to Accusoft, namely, the right to distribute copies of his codes contained in the Library. In order to execute a transfer of copyright ownership, the instrument must be in writing and signed by the owner of the rights conveyed. 17 U.S.C. § 204(a).

In this case, under both the March 1992 Agreement and February 1993 Extension, Palo granted to Accusoft the exclusive distribution rights of his codes contained in the Library. Pursuant to 17 U.S.C. § 201(d)(2), Accusoft is thus "entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner." This Court finds that the evidence will likely show, however, that Palo retained his other exclusive rights in his codes, namely, the right to reproduce the codes and the right to prepare derivative works based upon those codes.

Palo could terminate the exclusive grant of a transfer or license of any right under a copyright if 1) the transfer or license agreement specifically provided an earlier termination date or allowed Palo the right to terminate the agreement under certain circumstances, see H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 128 (1976); S.Rep. No. 473, 94th Cong., 1st Sess. 111 (1975), U.S.Code Cong. & Admin.News 1976 at 5659, 5726, 5743, or 2) Palo complied with the conditions set forth in 17 U.S.C. § 203. This Court finds that a rational reading of the "termination" clause of the Extension indicates that the parties intended that the license would be terminated only upon mutual consent. The Extension neither provides a termination date nor specifies conditions under which Palo could unilaterally terminate the license. Therefore, this Court concludes that the Copyright Act, § 203 controls, and that Palo can only terminate the license during a period of five years beginning at the end of thirty-five years from the date of execution of the grant.

Although § 203 was clearly not intended to "change the existing state of the law of contracts concerning the circumstances in which an author may cancel or terminate a license ...", Id., this Court cannot, based upon the evidence thus far presented to it, conclude that such circumstances existed at the time that Palo attempted to terminate the license in late January, 1996. This Court finds that there is, therefore, a likelihood that Palo's transfer to Accusoft of his right of distribution will continue in effect for the next three decades.

Accordingly, this Court concludes that, based upon the facts as it sees them, Palo has shown a likelihood of success of proving that 1) he is the copyright owner of many of the codes contained in the Library and 2) he retained the exclusive right to reproduce those codes and to prepare derivative works based upon those codes. At the same time

this Court concludes that Accusoft has shown a likelihood of success of proving that it is the current owner of the exclusive right to distribute those codes, based upon a valid license or transfer of that right by Palo to Accusoft.

### B. *Balance of the hardships*

In determining the appropriate preliminary injunctive relief, if any, to be granted on the parties' respective copyright infringement claims, this Court must also consider the hardships that will be imposed on either side. The First Circuit Court of Appeals has stated that where the only hardship that a nonmoving party will suffer is "lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'" *Concrete Machinery Co.*, 843 F.2d at 612 (citation omitted). This is true even when the nonmoving party's business is exclusively based upon the infringing activity and would be virtually destroyed by a preliminary injunction. *Id.*

█ In this case, it is clear that injunctive relief based upon a proper application of copyright law will cause substantial hardship to each party. Specifically, if Accusoft and Warner are enjoined from reproducing those codes in the Library which belong to Palo and from preparing derivative works based upon such codes, and if Palo and Wieczner are enjoined from distributing the Library in violation of Accusoft's exclusive right to distribute, all parties will effectively be put out of business pending resolution of these and other issues at trial. Because this Court concludes, however, that each moving party has shown a strong likelihood of proving ownership of certain rights to the Library protected by copyright law, and because it finds that a balancing of hardships weighs in neither party's favor, it will issue the appropriate injunctive relief notwithstanding the claim of each party that a preliminary injunction would have a substantially adverse impact upon their respective businesses.

### IV. ORDER

█ This Court therefore issues the following injunction pursuant to the authority granted in 17 U.S.C. § 502(a) and Fed. R.Civ.P. 65(d):

A. Palo, Wieczner, Snowbound Software and the officers, agents, servants, employees, and any other person or entity in active concert or participation with them during the pendency of this action, are hereby enjoined from distributing the RasterMaster Library as a whole and any of its separate components. Those same parties are also enjoined from interfering with any existing customers who are under contract to license the Library from Accusoft.

B. Accusoft, Warner and the officers, agents, servants, employees, and any other person or entity in active concert or participation with them during the pendency of this action, are enjoined from exercising the other exclusive rights belonging to Palo under 17 U.S.C. § 106, namely 1) the right to reproduce codes owned by Palo, which are those codes brought with him in 1992 and those codes produced by him since that time, in any form, including the renewal of any current licenses of the Library to third parties, and 2) the right to prepare derivative works based upon those codes, including the use or disclosure of the codes, as such rights are defined and construed under the Copyright Act. Those same parties are also enjoined from making any public statements that they own those rights to the Library or that Palo does not own those rights to the RasterMaster Library.

The injunctions hereby imposed shall remain in effect until a trial on the merits, which has been scheduled to begin on June 3, 1996, has been completed.

To the extent that the parties have moved for other forms of injunctive relief, their motions are denied. Specifically,

C. Accusoft's requests that Palo and Wieczner be 1) enjoined from using information contained in Accusoft's prospect and customer order databases or any other confidential files, 2)

required to return such databases and files, 3) enjoined from representing that they own or that they substantially developed the Library, 4) enjoined from claiming that they formerly worked for Accusoft, 5) required to return all copies of the Library and RasterMaster Library, and 6) required to provide a full accounting of all transactions involving the Raster-Master Library, are DENIED.

D. Accusoft's request that Wieczner be enjoined from 1) competing with Accusoft in the image processing software business until December 22, 1996, and 2) trying to hire Accusoft employees until after June 22, 1996, is DENIED.

E. Palo's request that Accusoft and Warner be required to return all source codes and other documentation of the Library is DENIED.

Finally, pursuant to Fed.R.Civ.P. 65(c), this Court requires both the plaintiff, Accusoft, and consolidated plaintiff, Palo, to post bonds on or before the close of Court business on Monday, May 13, 1996, in the amount of Fifty Thousand Dollars ($50,000) for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

If at any time the parties jointly agree to a workable modification of this injunction, in whole or in part, this Court will favorably entertain such a joint stipulation.

So Ordered.