**GREEN BOOK INTERNATIONAL CORPORATION, Plaintiff,**

v.

**INUNITY CORPORATION, Defendant,**

v.

**DATAWARE TECHNOLOGIES, INC., and John A. Hagerty, Additional Defendants in Counterclaim.**

No. C.A. 98–10256–DPW.

United States District Court, D. Massachusetts.

April 3, 1998.

Christopher T. Vrountas, Cooke, Clancy & Gruenthal, Boston, MA, for Green Book Intern. Corp.

Robert W. Mahoney, Hale & Dorr, Boston, MA, David S. Weiss, Goulston & Storrs, Boston, MA, for Inunity Corp.

*MEMORANDUM AND ORDER REGARD-ING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DOCKET NO. 4)*

KAROL, United States Magistrate Judge.

Plaintiff, Green Book International Corporation ("GBIC"), is a developer of computer software. It is suing InUnity Corporation ("InUnity") and others for copyright and trademark infringement and related acts of unfair competition with respect to an electronic publishing program which GBIC markets under the name "GBook." By its present motion it seeks a preliminary injunction enjoining InUnity from "all infringing activity" concerning GBook. (Plaintiff Green Book International Corporation's Motion for (1) Preliminary Injunction and (2) Expedited Discovery ("GBIC's Motion for Preliminary Injunction") at 2, Docket No. 4.) GBIC and InUnity have consented to my exercise of jurisdiction over this particular motion, but not over the case as a whole. *See* 28 U.S.C. § 636(c)(1) (West 1993) (magistrate judge, with consent of parties, "may conduct *any or all* proceedings in a jury or nonjury civil matter") (emphasis added). On March 18, 1998, I conducted a hearing on GBIC's motion. Because both parties agreed at a preheating conference that I could base my decision solely on the substantial documentary record compiled by the parties, the hearing was non-evidentiary. Based on that record and the arguments of counsel, I conclude, for reasons set forth below, that GBIC's Motion for Preliminary Injunction must be **DE-NIED.**

## I. *FACTS*

### A. *Background*

Beginning sometime in the early 1990s, GBIC developed and obtained copyright and trademark protection for GBook. GBook is an electronic publishing program comprised of two components—an authoring component (referred to as "GBook Designer") and a viewer component (referred to as "GBook Viewer"). The authoring component permits an author of a document, such as a financial prospectus, to prepare that document in electronic form and post it on the Internet or store it on a disc or CD–ROM; the viewer component permits a person with access to the Internet or in possession of the disc or CD–ROM to view the document or any selected portion of it on a computer screen. Dominic Sotirescu ("Sotirescu"), one of the founders of GBIC and the developer of GBook, describes the product as follows:

> GBook is a state of the art electronic book publishing software program designed to allow people to eliminate paper by publishing on the Internet, on diskettes and CD–ROMs. It has two components: GBook Designer and GBook Viewer (either Deluxe or Lite). The document author uses GBook Designer to create an electronic document. A copy of GBook Viewer is distributed with the document created by an author. A reader views the document using the GBook Viewer. GBook Viewer Deluxe and Lite provide a menu driven interface and hypertext links that allow readers to skip to a related topic and back again by clicking the mouse. They also provide multimedia capabilities. GBook Viewer Deluxe also provides search engine capabilities.

(Affidavit of Dominic Sotirescu ("Sotirescu Aff.") ¶ 4, Docket No. 6.) In more general terms, InUnity characterizes GBook as a "product for distributing information in diskette or CD–ROM form" and as a "substitute for the traditional distribution of information in paper format;" GBIC adopts this characterization in its principal brief. (Memorandum in Support of Plaintiff's Motion for: (1) Preliminary Injunction and (2) Expedited Discovery ("Memo. in Supp. of Motion for

Preliminary Injunction"), at 3, Docket No. 5.)

For many years, Sotirescu had been a friend and professional colleague of Sergiu S. Simmel ("Simmel"), Vice President of Technology of InUnity and of InUnity's wholly-owned subsidiary, H–Net. In 1995, Sotirescu gave Simmel a complimentary copy of GBook. In 1996 and 1997, under circumstances discussed below, InUnity purchased three additional copies. Between 1995 and the fall of 1997, Sotirescu and Simmel were in frequent communication concerning GBook's capabilities and at least five related matters: (1) InUnity's acquisition and intended commercial use of a so-called private label version of GBook to produce documents in electronic form for fee-paying customers and to provide those customers with the means to distribute such documents, in large quantities and in readable form, to the customers' customers; (2) modifications which GBIC might make to GBook to improve its functionality and make it more marketable; (3) InUnity's outright purchase of GBIC; (4) InUnity's acquisition of an exclusive license for GBook; and (5) InUnity's acquisition of a copy of GBook's source code and the right to modify it to enable InUnity to create and sell derivative products. In time, disputes arose concerning each of these matters; in fact, the dispute concerning InUnity's right to the source code has already resulted in an arbitral award in Canada. While all these matters are related, GBIC's motion for preliminary injunction concerns primarily the first topic: InUnity's acquisition and use of a private label version of GBook to create electronic documents for fee-paying customers and to provide those customers with a means to distribute the documents in readable form to their customers on a large scale.

For purposes of the pending motion, a number of facts are not in serious dispute. Among them, InUnity does not dispute that GBIC is the rightful owner of GBook; that GBook is an excellent product which can be used to create documents such as prospectuses and other financial reports in electronic form; that it is using a private label version of GBook (i.e., a version that causes InUnity's name to be substituted for GBIC's in the software and to be visible to the user) as one component of a purported proprietary product it calls "Digital Direct;" that it has loaded four, private label copies of GBook onto four of its computers, which it uses to create documents in electronic form for fee-paying customers such as Travelers Insurance Company ("Travelers"); that, as part of the service it provides its customers, it furnishes each customer for whom it creates an electronic document with up to a million or more "free" copies of GBook Viewer, which the customer in turn distributes to its customers to enable them, i.e., the customer's customers, to read the electronic document on their own computer screens; and that it may not lawfully do what it is doing without an appropriate license from GBIC. InUnity contends, however, that it has the necessary license.

GBIC, for its part, does not dispute for purposes of the pending motion that InUnity has a license; that InUnity has loaded GBook onto only four of its own computers; and that InUnity has not made any unauthorized copies of GBook Designer or resold or otherwise distributed GBook Designer to its customers. It contends, however, that InUnity has a license to use only the three copies of GBook that it actually purchased (i.e., not the complimentary copy that Sotirescu gave to Simmel) and, far more important, that it does not have a proper license to create electronic documents commercially for third parties or to distribute "free" copies of GBook Viewer to such third parties for redistribution by them to their customers. Putting it another way, GBIC contends that InUnity's activities exceed the scope of any license it does have. It also contends that InUnity violated the terms of its license at least to the extent that it modified the GBook software to delete virtually all references to GBIC or GBook and to replace the deleted references with references to InUnity or Digital Direct, or, in the alternative, that it fraudulently induced GBIC itself to make such modifications. Finally, GBIC also contends that, regardless of the scope of InUnity's rights under and the extent of InUnity's compliance with whatever license it does have, InUnity is making false advertising claims concerning the proprietary nature of Digital Direct, or, at least, that portion of it

that consists of nothing more than the private label version of GBook Viewer—which InUnity apparently renamed "Digital Prospectus."

In order to evaluate GBIC's likelihood of success on the merits, we must above all resolve the parties' conflicting claims regarding the scope of InUnity's license—a conflict which goes to the heart of the dispute about GBIC's entitlement to a preliminary injunction. To do so, we must consider at least the express terms of the license, and possibly also the course of dealing between the parties and usage of trade, all in relationship to InUnity's admitted commercial use of GBook.

### B. *InUnity's License*

Consistent with custom and practice in the off-the-shelf software industry, each package of GBook, including the complimentary package that Sotirescu gave to Simmel and each of the three packages that InUnity purchased, contains within it a so-called "shrink wrap" license. Neither party disputes the fact that the shrink wrap license in GBook is a form of agreement that defines the rights and obligations of the owner/licensee of that software. The GBook license provides, in pertinent part:

#### 1.5 Licensing

The GBook software package includes two pieces of software:

- GBook Designer; and
- GBook Viewer.

The software license for the *GBook package* entities you to install the GBook Designer software on only one single-user computer. Installation on a network requires a special network license.

The GBook Designer software and its documentation are subject to the following licensing agreement:

1. This product is protected by copyright law and international treaty provisions. You must not allow copies to be made and distributed to anyone else. . . .

2. You may not execute or allow any reverse engineering of any part of the software. You shall not modify, disassemble or decompile, or allow anyone to modify, disassemble or decompile the software or any part of the software in any way.

3. You may not load the software onto more than one single-user computer. This is illegal and cheats the publishers and programmers of their rightful income. Installation on a network requires a special network license.

4. Treat the software like a book—two people cannot easily read the same book at the same time. Therefore, each person who wants to read a book needs to purchase his or her own individual copy. . . .

   \*     \*     \*     \*     \*     \*

*GBook Viewer Lite* is subject to the same licensing agreement except items 1 and 3. You may distribute any number of GBook Viewer Lite to users.

(GBook 1.5 Licensing, Ex. A, Docket No. 6 (underscoring in original).)

Considering first only the GBook Designer (*i.e.*, the authoring) component of GBook, it is difficult to see how InUnity's activities with respect to that component violate any express provision of the license. InUnity contends, and GBIC does not dispute, that at no time did InUnity have more than four computers loaded with GBook Designer; it made no additional copies of GBook Designer; and it did not distribute copies of GBook Designer to anyone else. (*See, e.g.,* Def.'s Opp. to Motion for Preliminary Injunction at 14–15, Docket No. 12.) Nor did it "modify, disassemble or decompile" GBook Designer (although, as will be discussed below, it paid GBIC a modest additional fee for a private label version of GBook Viewer, from which GBIC itself deleted most references to itself and GBook). (*See* Simmel Aff. ¶ 32, Docket No. 13.) Finally, no express provision of the license purports to restrict InUnity's right to make commercial use of its own lawfully acquired copies of GBook Designer to create electronic documents for fee-paying customers such as Travelers, who choose, for whatever reason, not to purchase GBook themselves for in-house use. It is not surprising, therefore, that GBIC had little to say at oral argument regarding InUnity's alleged misuse of GBook Designer, other than to maintain that InUnity had no right under the license to use the complimentary copy that Sotirescu gave Simmel in 1995. GBIC did not develop

this argument in its brief, however, and there is no obvious support for its position in the express language of the license itself.[1]

The question of whether InUnity's activities concerning GBook Viewer Lite (the viewer portion of GBook) violate the express terms of the license is closer, but only slightly so. As noted, InUnity does not deny that it provides its customers with virtually unlimited copies of a private label version of GBook Viewer Lite so that each of its customer's customers to whom the electronic document is distributed will have the capability of reading such document on his or her own computer. Indeed, it is perfectly apparent that, without such viewer, the electronic document would be useless, since the persons for whom it was created would be unable to read it. But it is not at all clear that such wholesale copying and distribution of GBook Viewer Lite by InUnity or any other licensee violates any express term of the license. To the contrary, consistent with the licensee's evident purpose in acquiring GBook in the first place, the license quite unremarkably states that the licensee "may distribute any number of GBook Viewer Lite to users." One might argue about whether the term "users" in this context refers to InUnity's customers (*e.g.*, Travelers) or the customer's customers, but that hardly seems to matter. If the user is deemed to be Travelers, there is no obvious inconsistency between the express terms of the license and InUnity's actual practice. If, on the other hand, the user is deemed to be Traveler's customers, the express terms of the license would appear to permit InUnity to distribute mass quantities of GBook Viewer directly to Traveler's customers, in accordance with a distribution list provided by Travelers, with the same result.

I conclude, therefore, that GBIC would face an uphill battle on the merits of the licensing issue if it were required to rely exclusively on the express terms of the shrink wrap license. Significantly, GBIC did not disagree, when I expressed this view at oral argument. It nevertheless insisted that it was appropriate also to consider the parties' course of performance and usage of trade, both of which, it maintained, strongly supported its position. Assuming, for purposes of the pending motion, that course of performance and usage of trade are relevant considerations, I am, for reasons that I will now discuss, not persuaded that either lends strength to GBIC's position.[2]

### C. *Course of Performance*

At least as early as 1996, GBIC advertised GBook on its Web Home Page. A copy of the

---

1. Perhaps GBIC might have argued that Paragraph 4 of the license, which admonishes users to "[t]reat software like a book—two people cannot easily read the same book at the same time," proscribes any licensee, including a gratuitous one such as Simmel, from purporting to transfer its rights in the license to anyone else. Although it would be premature to issue a definitive ruling of law at the preliminary injunction stage, particularly with respect to an argument that GBIC has not made and which neither party has briefed, it is not too soon to note several reasons why this argument is problematic. First, there is no evidence that Simmel and InUnity both attempted to use GBook "at the same time," rather than in succession. Second, any attempt by GBIC to impose restrictions on the number of persons who might, in succession, use a single, lawfully-acquired copy of GBook would seem to conflict with Paragraph 3 of the license, which limits use to "only one single-user computer," without any additional restriction on the identity of the person who, from time to time, physically sat at and operated such computer. Finally, this argument would seem to conflict with the "first sale" doctrine, codified at 17 U.S.C. § 109(a) (West 1996). *See Microsoft Corp. v. Harmony Computers & Electronics, Inc.*, 846 F.Supp. 208, 212 (E.D.N.Y.1994) (stating that "first sale" doctrine entitles the owner of a lawfully acquired copy of a copyrighted work to sell or dispose of the copy without authorization from the copyright holder); *Walt Disney Productions v. Basmajian*, 600 F.Supp. 439, 442 (S.D.N.Y.1984) (finding that defendant, under the "first sale" doctrine, was entitled to sell copyrighted, original Disney artwork that he had lawfully acquired as a gift from plaintiff, the copyright holder).

2. Neither party briefed the issue whether, and the circumstances under which, a factfinder is permitted under applicable law to consider extrinsic evidence regarding the meaning of a copyright license, when the express terms of the license do not appear on their face to be ambiguous in any respect. Indeed, neither party addressed the question of which nation's, state's, or province's law applies in the particular circumstances of this case, which involves an Ontario, Canada licensor and a Massachusetts licensee. Because it makes no difference to the outcome of the instant motion, I will assume, without deciding the issue, that I may consider course of performance and usage of trade.

Home Page, in substantially the form in which it appeared through the fall of 1997, is attached as Exhibit B to the Affidavit of Sergiu S. Simmel ("Simmel Aff.") (Docket No. 13). The second page of that exhibit, bearing identification number 000021, describes GBIC's various product offerings and includes instructions to readers about how they may order electronically the described products using an order form that was also included in the Home Page. GBIC there describes the basic GBook package as follows: "Includes one copy of GBook Designer Enterprise plus GBook Viewer Deluxe (with full text search) licenses for 400 users and *unlimited GBook Viewer Lite licenses.*"[3] (GBIC Home Page at 000021, Ex. B, Docket No. 13 (emphasis added).) The same Home Page also includes a section, (*id.* at 000028–29), addressed to a type of distributor referred to as a "VAR," which presumably stands for "value-added reseller." The section does not define the term VAR or describe the terms on which a VAR license might be obtained, but it invites interested persons to call "to find out how you can become a VAR" for GBook. (*Id.* ) The next section of the Home Page is addressed to another type of distributor referred to as an "OEM," which presumably stands for "original equipment manufacturer." (*See id.* at 000030.) Again, GBIC does not define the term OEM, but does state in this section that an OEM interested in "private labeling" can, "[f]or a nominal fee," have its "product name, logo and copyright . . . accommodated." (*Id.*)

As noted, Sotirescu had given Simmel a copy of GBook as early as 1995. Thereafter and continuing through 1997, Sotirescu and Simmel had frequent discussions about InUnity's plan to offer to large financial institutions a service whereby, using a private label version of GBook, InUnity would convert the institution's prospectuses, reports, and similar documents into electronic form so that they, along with the viewer software needed to read them, could be distributed relatively inexpensively to the institution's customers. Sotirescu enthusiastically supported the idea and made several modifications to the software to facilitate its successful implementation, for which InUnity paid GBIC several thousand dollars in consulting fees. (Simmel Aff. ¶ 25, Docket No. 13.) In May 1996, sometime after these discussions had begun and Simmel had seen GBIC's Home Page, Simmel sent an e-mail to Sotirescu as follows:

> If one needs to distribute N GBook Viewers [sic] Lite *on behalf of a customer,* all one has to do is to purchase one copy of GBook Professional or Enterprise, use the included Designer to construct the book, and then distribute the Viewer Lite to an unlimited N number of places, correct?

(Simmel Aff. ¶ 18, Docket No. 13; E-mail dated May 22, 1996, Ex. C, Docket No. 13 (emphasis added).) This e-mail is unmistakably clear: InUnity was not interested in purchasing GBook to create electronic documents for its own use, but rather to make them "on behalf of" its customers, and, further, that it understood that, as long as it purchased "one" copy of GBook, it could provide its customer or its customer's customers with an "unlimited" number of viewers so that all the customer's customers could read the electronic document. Sotirescu's one-word response to Simmel's question was an unequivocal and unqualified, "Correct." (*Id.*)

> At the same time, Simmel posed another question. He asked:
>
> [D]o you offer private labeling for GBook products? In other words, if one wants to distribute Viewers [sic] Lite or Viewers [sic] Deluxe with some content, but wants their own name to appear (as opposed to GBook)—with the appropriate copyright attribution to GBIC—in the Help|About and in the initial banner, etc. . . . do you provide such an option? At what additional cost, if any?

---

3. *After* InUnity had made its purchases and the present dispute had arisen, GBIC modified its Web Home Page to add the following parenthetical to the product description: "(Commercial distribution of GBook Viewer Lite require [sic] a separate software license)." (Supplemental Affidavit of Sergiu S. Simmel ¶ 8, Docket No. 27; GBIC Home Page, Ex. 6, Docket No. 27.) GBIC contends, of course, that this requirement was always at least implicit in the license, but it does not go so far as to contend that this modification has retroactive effect.

(E-mail dated May 22, 1996, Ex. C, Docket No. 13.) Again, Sotirescu responded enthusiastically that the "latest version of GBook" includes just such capability, in that it:

> supports a new parameter on the command line a=text. If used the about dialog box uses that text instead of our own and the banner only displays the VAR's own image! Talk about thinking alike!

(*Id.*)

In early October 1996, following further discussion about InUnity's business plan, InUnity placed an order for its first copy of a private label version of GBook Professional. Its order was accompanied by a letter that clearly restated how InUnity intended to use the product and explained why it was so important that GBIC delete all references to itself and GBook and replace them with references to InUnity and Digital Direct:

> Attached is an order for GBook Professional and a private labeling customization fee for the viewer, per your quotation of $2,000. Upon delivery, please send us an invoice with your commercial terms.
>
> As I mentioned to you during our phone conversation, InUnity will be using the private labeled GBook to deliver information distribution services to our clients. Concretely, we are working with a very large customer in the Insurance industry to develop a mechanism for distributing financial information to their customers. As to the private labeled version of the "lite" viewer, we need that to contain our logo and information exclusively—to protect ourselves against our customers or prospects going around us. I will email you a graphic file of our logo ... for you to include in the splash screen. The name of our service product is **Digital Direct,** so the viewer should be renamed around this theme. You and I should work together for me to supply you with any information you need to assemble the private labeled version as soon as possible.
>
> Should you need us to sign any legal document that assures you of us protecting your copyright under our private label, please forward it to us.

(Simmel Aff. ¶ 23, Docket No. 13; Letter from Sergiu Simmel to Dominic Sotirescu dated October 3, 1996, Ex. G, Docket No. 13.) GBIC did prepare the private label version of GBook Viewer Lite that InUnity ordered, but, as far as the documentary record reveals, it did not pursue InUnity's offer to "sign any legal document" that GBIC felt it might need to protect its copyright.

Correspondence over the next several months further confirms that InUnity was completely open and candid with GBIC concerning its plans and, conversely, that GBIC did not, in writing at least, suggest that InUnity would need a special license to carry out those plans. For example, by e-mail dated December 9, 1996, Simmel "reminde[d]" Sotirescu that it was necessary to "fix the OEM version," because, "[f]or example, Travelers would like their umbrella to show up." (E-mail dated December 9, 1996, Ex. 1, Docket No. 27.) He went on to reemphasize how important it was to InUnity's marketing plan that the word "GBook and related" not appear anywhere other than in the "attribution in the Help|About dialog." (*Id.*) One month later, in response to questions by GBIC that were apparently precipitated by earlier requests by InUnity for financial assistance, InUnity went into considerable detail concerning its business plan, prospects, and products. It stated:

> Travelers Insurance Company (Hartford, CT) is the first customer of Digital Prospectus. There are several Travelers products for which we are currently developing Digital Prospectus versions. The first product for which we were engaged is Universal Annuity. Travelers will be about $1,000,000 in business from the existing products. Their potential exceeds $5,000,000. In general these customers are large. They deliver hundreds of thousands of documents to customers per fund, and many of the largest customers have dozens of funds....

(E–mail dated January 3, 1997, Ex. 2, Docket No. 27.) Along the same lines, on April 25, 1997, Simmel proposed further product modifications (for which InUnity would pay a fee to GBIC) and advised Sotirescu that he was on his way to "our manufacturing facility in Plymouth MA to orchestrate the production and fulfillment of **110,000 units** of the Travel-

ers Universal Annuity product, which will be shipped over the next 2 weeks!" (Letter from Sergiu Simmel to Dominic Sotirescu dated April 25, 1997, Ex. 3, Docket No. 27 (emphasis in original).) He then said: "Additionally, we will be starting work on 3 other Travelers products in early May," and he expressed optimism about generating business with The Hartford, "one of the largest insurance companies in the USA, and the largest provider of Variable Annuity products." (*Id.*)

In the summer of 1997, having kept GBIC well-advised of its activities and prospects, InUnity purchased two additional private label packages of GBook to accommodate its growing business needs. · GBIC did not at that time advise InUnity, in writing at least, that the standard shrink wrap license included in those packages would not suffice to permit InUnity to use those packages in the way that GBIC knew InUnity intended to use them.

It was not until November 20, 1997, that Sotirescu sent Simmel a letter demanding that InUnity pay for a VAR license if it wished to continue to provide document preparation services to its customers. Sotirescu stated:

> The GBook Viewer Lite is free of charge if downloaded from our WEB page. For a VAR like yourself to distribute GBook Viewer Lite to clients who then distribute the software to their own clients you or the client must acquire a license. . . .
>
> Each of the VAR clients (your clients in this case) must acquire a GBook Viewer License. This is a one time fee of $700 U.S. per client which gives them a perpetual license for distribution on diskettes and/or CD ROMS. The unlimited Internet distribution is $900 US.

You had a grace time of about two years. I think it is time now to solve this concern. (E-mail from Dominic Sotirescu to Sergiu Simmel dated November 20, 1997, Ex. 4, Docket No. 27.) Simmel promptly wrote back, professing surprise and confusion:

> You're baffling me. I am not understanding. We're not a VAR of GBook. We have not resold GBook to anyone. We have published and are publishing content

with GBook and distributed that with GBook Viewer Lite software for reading (as the license allows us—see below), but we're not a GBook reseller (VAR).

The GBook Enterprise product description on your Web site says:

> "Includes one copy of GBook Designer Enterprise plus GBook Viewer Deluxe (with full text search) licenses for 400 users and unlimited GBook Viewer Lite licenses."

We have bought GBook Enterprise licenses (probably about 3–4 licenses so far), and the price includes "unlimited" GBook Viewer Lite licenses. So we have already paid for all of this, haven't we?

Is my understanding correct? I am misinterpreting the GBook product descriptions and licenses? Please help me out . . .

(E–mail from Sergiu Simmel to Dominic Sotirescu dated November 20, 1997, Ex. 5, Docket No. 27.) As far as the documentary record reveals, GBIC never responded to Simmel's letter or took issue with Simmel's understanding.

The foregoing documentary evidence regarding the parties' course of performance overwhelmingly favors InUnity. It confirms and corroborates InUnity's interpretation of the shrink wrap license, and it undermines GBIC's claim that InUnity made or duped GBIC into making software modifications that had the effect of substituting InUnity's name for GBIC's in the user interface.

One searches nearly in vain through the documentary record for evidence that, notwithstanding the express and seemingly unambiguous language of the shrink wrap license and web site and GBIC's unequivocal response to InUnity's pointed inquiry in May 1996, GBIC in fact advised InUnity that it would need a special license to do the very thing that it had been telling GBIC for almost two years that it intended to do. The only hint of such advice is the passing reference to VARs in Sotirescu's May 22, 1996, response to Simmel's query about the feasibility of private labeling GBook products ("the banner . . . displays the VAR's own image"). (E-mail dated May 22, 1996, Ex. C, Docket No. 13.) From this single reference, buttressed slightly by the fact that GBIC's

web site encourages VAR prospects to call for further information, GBIC constructs a chain of reasoning that goes something like this: (1) when InUnity saw this reference to the type of distributor known in the trade as a VAR, it must have realized that GBIC considered InUnity to be a VAR; (2) InUnity must also have known that manufacturers of computer hardware and software generally expect their VARs to obtain a special reseller's license; and (3) therefore InUnity must have known that GBIC expected InUnity to obtain a special reseller's license. I will consider in the "Usage of Trade" section below the strength of the evidence that the term "VAR" has a sufficiently well defined meaning to be useful in the present context and that InUnity is in fact a VAR within the standard definition of such term. Suffice it for now to say that, when this case is ultimately decided on the merits, it is unlikely that this vague use of the term "VAR" in the context of a single e-mail will be deemed sufficient to have alerted InUnity to the fact that GBIC deemed it to be a VAR, and, therefore, that it expected InUnity to obtain a special reseller's license to do the very thing that it was inquiring about.[4] Therefore, it does not, for present purposes, offset the considerable contrary evidence regarding the parties' course of performance, let alone tip the overall balance in GBIC's favor when the express terms of the license are also added to InUnity's side of the "likelihood of success" scale.

To complete the picture and to be fair to GBIC, it should be noted that GBIC has presented additional, non-documentary evidence regarding the parties' course of performance. That evidence consists of sworn statements by Sotirescu to the effect that he often told Simmel that InUnity would have to obtain a special reseller's license, that Simmel often assured him that InUnity would do so, that he twice sent Simmel drafts of such a license to remind him that this unfinished business had to be resolved, and that the only reason he was willing to delete references to GBIC and GBook from the software and to make the other modifications that Simmel had requested was that Simmel had repeatedly assured him that InUnity would enter into a reseller's license. The problem with such evidence at this preliminary stage is that it is directly contradicted by sworn statements that Simmel has provided, resulting in a situation which, from GBIC's standpoint, can best be characterized as a draw. Indeed, even this characterization may overstate the strength of GBIC's position, given GBIC's unexplained failure to produce any corroborating documentation of the type one would expect to exist in abundance if Sotirescu's claims were true.[5]

### D. *Usage of Trade*

GBIC appears to make two closely related arguments regarding usage of trade. First, it contends that InUnity is a VAR and that it is well known that a VAR cannot sell another company's proprietary product without a special reseller's license. Second, it contends, without specifically characterizing InUnity as a VAR, that it is unprecedented in the software industry for a company to incorporate another company's software into its own product and then resell that product "as if it were its own without the benefit of a specific agreement to do so." (Affidavit of Christopher Egan ("Egan Aff.") ¶ 4, Docket No. 23.) Evidence in the record to support either contention is sparse and inconclusive, and the little that exists is not weighty enough to cause the scale to tip in GBIC's favor.

In evaluating the evidence proffered by GBIC on this issue, it is helpful to imagine a marketing spectrum. At one end of the spectrum would be a company that purchased another company's application software (such as a word processing program),

---

4. This is especially true where the *express* terms of the same e-mail in which the vague reference appears convey a contrary message.

5. Documentary evidence does confirm that, toward the end of 1997, the parties discussed the possibility that InUnity would acquire *exclusive* rights to market GBook products within the financial services and healthcare field. (*See, e.g.,* Letter from Michael Andrews to Scott Miller dated December 31, 1997 at 1, Ex. Q, Docket No. 13; Simmel Aff. ¶¶ 34, 35, Docket No. 13.) An exclusive license is different, however, than the reseller's license that Sotirescu now says he frequently discussed with Simmel beginning in 1996 and twice sent to him in draft form. (*See* Sotirescu Aff. ¶¶ 16, 22–23, 25–26, Docket No. 6.)

copied and repackaged it, and then resold the repackaged copies, either under the developer's name or its own. Few would quarrel with the proposition that this conduct, if done without authorization, would constitute unlawful bootlegging which a court ought enjoin as quickly as possible. A slightly less overt, but equally offensive, situation would be presented if a company purchased application software, copied it, and incorporated the copies into other products for resale. For example, a manufacturer of personal computers might pre-load a popular word processing program into its computers to make them more attractive to prospective purchasers, or a software vendor might incorporate a third party's spreadsheet program into a specialized accounting package that it was developing for small businesses. Again, if the reseller of the software did not have a license that expressly permitted it to make copies and distribute them in this manner, it would properly be subject to a swift injunction.

Now consider the other end of the spectrum. Suppose a professional typist purchased off-the-shelf word processing software which he or she used to create manuscripts for fee-paying clients. Regardless of the number of clients for whom the typist created manuscripts or the number of manuscripts he or she created, such commercial use would raise few, if any, eyebrows, provided the typist did not load the software onto more than one computer or make additional copies of the software and distribute it to his or her clients.

Assuming, *arguendo*, that evidence regarding usage of trade can ever supplant or modify the express and seemingly unambiguous terms of a license, the obvious question this conceptual exercise raises is this: what if anything does the usage of trade evidence proffered by GBIC tell us about where on the spectrum InUnity's activities fall? On the one hand, we know that, unlike the disreputable companies at the unlawful end of the spectrum, InUnity is not copying and reselling GBook in its entirety. We know this because it is not copying, distributing, or reselling GBook Designer (the authoring component of GBook), and it is not otherwise providing its clients with the capability of using GBook Designer to create their own electronic documents. Indeed, InUnity is not even loading GBook Designer onto an excessive number of its own computers. As far as GBook Designer is concerned, InUnity, like the typist in the hypothetical case, is using the software for its intended purpose of creating documents, albeit commercially for fee-paying clients. On the other hand, unlike the hypothetical typist, InUnity is creating and distributing multiple copies of a component of the purchased software—GBook Viewer Lite. Does this undisputed fact push InUnity's conduct back toward the unlawful end of the spectrum? Citing its usage of trade evidence, GBIC says it surely does. InUnity, with equal conviction, says it surely does not, not just because the license, by its express terms, permits it to do precisely what it is doing, or because no one would ever purchase GBook to create electronic documents if the package did not include the right to distribute to the intended readers the indispensable tool they would need to read them, but because GBIC's usage of trade evidence is not relevant to InUnity's activities.

Turning, then, to the usage of trade evidence, GBIC relies heavily on its purported characterization of InUnity as a VAR, but the record is virtually silent as to how the industry defines that term and what significance it attributes to it. The little evidence that exists consists of a section of GBIC's Home Page entitled "VARs," (Home Page at 000028, Ex. B, Docket No. 13), and a certain "Reseller Agreement" dated April 3, 1997, between GBIC and a company called McCurdy Printing located in Halifax, Nova Scotia, submitted by GBIC as Exhibit B to the Supplemental Affidavit of Dominic Sotirescu (Docket No. 20).

The GBIC web site is not very enlightening. It encourages prospective VARs to call for more information about GBook, promises "sales support, technical support, and training," and advises VARs that they may either "sell[ ] GBook itself" or "integrate GBook into their office solution system . . . ." (Home Page at 000028, Ex. B, Docket No. 13) From this, one might reasonably infer that a VAR is someone that has the right to resell

GBook, including GBook Designer, in its entirety, either as a standalone product or as part of an "office solution system." A reseller engaged in such activities would be distributing copies of the authoring software to customers, which would enable them to create their own documents. This is not what InUnity is doing, however. InUnity lawfully purchased GBook and is using GBook Designer for its intended purpose of *creating* documents; it is not "[re]selling GBook itself." Indeed, unless InUnity's free distribution of GBook Viewer to intended readers of the documents it *creates* using GBook Designer is deemed to constitute a sales transaction, InUnity is not *re* selling anything. This would appear to be a significant distinction for purposes of determining whether InUnity is a VAR, as that term is used in the GBIC Web Home Page, let alone for purposes of determining whether the *industry* would consider InUnity to be a VAR and, if so, where that would place InUnity on the marketing spectrum.

The "Reseller Agreement" between GBIC and McCurdy suffers from the same infirmity. Even if we assume that this single agreement between an Ontario licensor and a Nova Scotia licensee sets the standard throughout the industry for determining who is a VAR and for defining the rights and obligations of VARs generally, the Reseller Agreement still tells us little if anything about whether InUnity is a VAR and what connotation that designation carries within the industry. The agreement provides, in pertinent part, that McCurdy may, within a prescribed territory, "market and resell the Product." (Reseller Agreement at 2, § 1.1, Ex. B, Docket No. 20.) But "Product" is defined as "a computer program known as GBook...." (*Id.* at 1.) It would appear, therefore, that McCurdy, like the VARs to whom GBIC's Web Home Page is addressed, is authorized to resell GBook in its entirety, including GBook Designer.[6] Again, this is not

what InUnity is doing. Thus, even assuming McCurdy is a VAR, the McCurdy Reseller License tells us little if anything about whether InUnity is also a VAR or where its activities fall on the marketing spectrum.

The last significant item of evidence concerning usage of trade is the Affidavit of Christopher Egan (Docket No. 23). Egan, an employee of GBIC's corporate parent, claims to have had experience since "the early 1990s ... sell[ing], distribut[ing] and develop[ing] software product that contained third-party software." (Egan Aff. ¶ 2, Docket No. 23.) Based on that experience, he maintains, without reference to VARs per se, that companies that incorporate into their own products software developed by another company must have express authorization to do so. He states, in pertinent part:

> When one incorporates third party software in a product developed for sale on the open market, it is standard industry practice to give credit to the third-party software provider. It is also standard in the industry to account for the sales of such third-party software and to report such sales to a technology provider. I have never seen a company purchase end user software on the open market, incorporate it into another product, and sell it as if it were its own without the benefit of a specific agreement to do so.

(*Id.* ¶ 4.)

Again, GBIC's evidence is far from conclusive, if for no other reason than that it describes a type of activity which appears to differ significantly from the activity in which InUnity is engaged. InUnity did not "incorporate" GBook into a "product developed for sale on the open market." If it did, its customers would have the capability of creating their own documents. Rather, it is using GBook as any end user would: to create

---

6. At oral argument, GBook's counsel insisted that, notwithstanding the seeming breadth of the Reseller Agreement, McCurdy is not permitted to resell GBook in its entirety and is not in fact doing so. His explanation for the apparent discrepancy between the express terms of the agreement, on the one hand, and the parties' intent and McCurdy's actual practice, on the other, is

that GBIC and McCurdy, both being small companies, used a form reseller agreement that did not accurately reflect their true understanding. Perhaps, but I must take the evidentiary record as I find it. The Reseller Agreement, as written, *is part of that record;* unsupported representations of counsel are not.

documents. It is also not clear from the affidavit that Egan has any personal experience with the specific type of business InUnity is engaged in, where the purchaser of third party software uses one component of that software commercially to perform a service and then distributes copies of the second component, without which the service would be useless. Indeed, it is conceivable that InUnity's marketing concept is *sui generis*, or at least unusual, to the extent it utilizes packaged software comprised of two components, one of which the developer knows *must* be given away if the purpose for which the package is purchased is not to be entirely frustrated. In any case, Egan's testimony is far too general to outweigh the express terms of the shrink wrap license and the parties' course of performance (including GBIC's unmodified web site).[7]

### E. *Facts Relating to Remaining Claims*

GBIC not only contends that InUnity's use of GBook exceeds the scope of its license, but it also contends that InUnity has made false and deceptive claims to the effect that Digital Direct and Digital Prospectus are its own proprietary products. This claim is based in part on GBIC's contention that the copyright notice that appears in InUnity's private label version of GBook does not give sufficient credit to GBIC's ownership and development of GBook.[8] At oral argument, however, GBIC conceded that the copyright notice that appears in Digital Prospectus was in fact created by GBIC. Indeed, since the substance and appearance of the notice are functions of the source code, to which only GBIC has access, no one other than GBIC could possibly have created the notice. GBIC therefore cannot complain that the notice is inadequate.

Along the same lines, GBIC also claims that "InUnity's conduct constitutes classic 'reverse palming off,' that is, the removal of plaintiff's product's identifying marks before reselling the goods without authorization."

(Memo. in Supp. of Motion for Preliminary Injunction at 13, Docket No. 5.) As previously discussed, however, GBIC itself removed the identifying marks, in exchange for a $2,000 private labeling fee. Further, given the uncertainty regarding the scope of InUnity's license, there is at least a serious question whether InUnity's marketing activities are "without authorization."

This leaves for consideration GBIC's claim that InUnity is falsely representing in its advertising or promotion that Digital Direct and its viewer component, Digital Prospectus, constitute technology that is proprietary to InUnity. (*Id.* at 8.) GBIC claims that such representations "are indisputably false, as InUnity admits that Digital Prospectus is essentially GBook Viewer and that [GBIC] developed the GBook Viewer software." (*Id.*) GBIC further protests that such statements are "calculated to and in fact did mislead customers into believing that InUnity developed the software, depriving [GBIC] of the sales and market goodwill associated with ... GBook software." (Id.)

Assuming, as appears to be the case, that Digital Prospectus is simply a renamed version of GBook Viewer, it is certainly true that Digital Direct is based on technology developed by GBIC, not InUnity. On the other hand, as early as October 1996 InUnity made full disclosure to GBIC of its plan to call its version of GBook "Digital Direct." More to the point, InUnity paid GBIC a private label customization fee of $2,000 to rename GBook Viewer around the "Digital Direct" theme (as in "Digital Prospectus") and to modify the source code to delete from the user interface any reference to GBIC or GBook. All this was done for the express purpose of securing for InUnity the goodwill associated with Digital Direct and Digital Prospectus. This is all clearly set forth in InUnity's letter to GBIC dated October 3, 1996, as follows:

---

**7.** It is not my intention to suggest that, as a matter of law, GBIC may not require future purchasers of GBook to obtain a special license if they wish to use it in the manner that InUnity has. It is only to say that the record presently before the court is not persuasive that InUnity's existing shrink wrap license, by its express terms or as interpreted in light of course of performance and usage of trade, does not permit such use.

**8.** A copy of the actual notice appears as Exhibit L to the Affidavit of Sergiu S. Simmel (Docket No. 13).

Attached is an order for GBook Professional and a private labeling customization fee for the viewer, per your quotation of $2,000....

As to the private labeled version of the "lite" viewer, we need that to contain our logo and information exclusively—to protect ourselves against our customers or prospects going around us. I will email you a graphic file of our logo ... for you to include in the splash screen. The name of our service product is **Digital Direct,** so the viewer should be renamed around this theme. You and I should work together for me to supply you with any information you need to assemble the private labeled version as soon as possible.

Should you need us to sign any legal document that assures you of us protecting your copyright under our private label, please forward it to us.

(Letter from Sergiu Simmel to Dominic Sotirescu dated October 3, 1996, Ex. G, Docket No. 13 (bold type in original).) It appears, therefore, that GBIC not only knew about and acquiesced in all pertinent aspects of InUnity's marketing plan long before it brought this action, but, for a fee, it made the necessary changes to the GBook source code without which such plan could not have been launched. This is the same plan, apparently, that GBIC now complains is "depriving [it] of the sales and market goodwill associated with ... GBook software." (Memo. in Supp. of Motion for Preliminary Injunction at 8, Docket No. 5.)

## II. DISCUSSION AND LEGAL ANALYSIS

### A. Standards for Preliminary Injunction

Traditionally, the First Circuit uses a four-part test to determine whether a preliminary injunction should issue. Under that four part test, a court must consider (1) likelihood of success on the merits, (2) irreparable harm, (3) balancing of the equities, and (4) public interest. *E.g., Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). To the extent

GBIC is claiming that InUnity is not authorized to make copies of GBook Viewer and distribute them to its customers, however, its claim is one for copyright infringement, and claims for copyright infringement are subject to a modified preliminary injunction standard. Under that modified standard, the court must ordinarily presume that the plaintiff has suffered irreparable harm and that an injunction will serve the public interest if the plaintiff demonstrates a likelihood of success on the merits. *E.g., Concrete Machinery Co. Inc. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 611–612 (1st Cir.1988).[9] This leaves only the first and third factors for consideration in a typical copyright infringement case: likelihood of success on the merits and balancing of the equities. The two are related, in the sense that the balancing must take into account the strength of the plaintiff's case. In other words, the greater the likelihood is that plaintiff will succeed, the less consideration will be given to the harm that the injunction will cause the defendant. Conversely, if the plaintiff has made only a minimally sufficient showing that it is likely to succeed, more consideration will be given to the harm that the defendant will suffer if the injunction is wrongly issued relative to the harm to the plaintiff if it is wrongly denied. *See id.* at 612–613.

Not all of GBIC's claims are for copyright infringement, however. The various claims for false advertising or promotion, and the related claim for "reverse palming off," are brought under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) ("Section 43(a)"). The modified preliminary injunction standard applicable in copyright infringement cases may not apply in *all* cases under Section 43(a) in which plaintiff demonstrates a likelihood of success, but there is no question that the presumption of irreparable harm is applicable in at least some of them. *See Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corporation,* 799 F.2d 6, 14–15 (1st Cir.1986) (irreparable

---

**9.** One exception to the rule that irreparable harm is presumed in a copyright infringement case when plaintiff seeks a preliminary injunction and demonstrates a likelihood of success on the mer-

its is where plaintiff does not bring suit within a reasonable time of learning of the infringement. *E.g., Fritz v. Arthur D. Little, Inc.,* 944 F.Supp. 95, 98 (D.Mass.1996).

harm is presumed in cases under Section 43(a) where "defendant is wrongfully trading on the plaintiff's reputation" or where "defendant's representations are literally false," but perhaps not where defendant's representations have "merely" a "tendency ... to deceive"). I need not decide whether the presumption applies to the type of allegations made in the present case, however, because, as discussed below, GBIC has not demonstrated a likelihood of success on the merits.

### B. *Substantive Law*

Of course, to determine whether plaintiff has demonstrated a likelihood of success on the merits, one must consider the substantive law, as applied to the facts preliminarily determined on the basis of the record developed on plaintiff's motion. To prevail on the merits of its copyright claim, GBIC must prove "(1) ownership of a valid copyright, and (2) unauthorized copying of constituent elements of the work that are original." *Accusoft Corp. v. Palo*, 923 F.Supp. 290, 295 (D.Mass.1996), *citing Lotus Development Co. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir.1995), *aff'd*, 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996). To prevail on its Section 43(a) claims, GBIC must prove, *inter alia*, that InUnity used a name or false designation of origin in connection with Digital Direct or Digital Prospectus that is likely to cause confusion or mistake or to deceive, or that InUnity made misrepresentations in its advertising or promotion with respect to these products. *See* 15 U.S.C. § 1125(a) (West 1998). Claims for violation of Section 43(a) are subject, however, to equitable defenses such as acquiescence, estoppel, and laches. *Kasco Corp. v. General Services Inc.*, 905 F.Supp. 29, 35 (D.Mass.1995) (and cases cited).

### C. *Application of Law to Facts*

Based on the facts set forth in Section I, GBIC has not demonstrated a likelihood of success on any of its claims for copyright infringement or violation of Section 43(a).

■ Concerning copyright infringement, it is unlikely, based upon the evidence presented to date, that GBIC will be able to demonstrate that InUnity's use of GBook was unauthorized. InUnity did not make copies of GBook Designer or distribute it to customers; it did not modify GBook Designer; and it did not load any single copy of GBook Designer onto more than one computer. It did make and distribute copies of GBook Viewer, but the license, consistent with the Web Home Page before GBIC recently modified it and with the parties' course of dealing in other respects, permitted InUnity to "distribute any number of GBook Viewer Lite to users." (See GBook 1.5 Licensing, Ex. A, Docket No. 6.) While it is conceivable that the odds of an outcome in GBIC's favor will improve as a result of its obtaining additional evidence through ongoing investigation and discovery, GBIC has not demonstrated that such outcome is sufficiently probable to warrant the issuance of an injunction at this time. Moreover, even if GBIC had made a minimally sufficient showing of likelihood of success, the balance of equities would still tip in InUnity's favor, given that an injunction would likely put it out of business, resulting in a loss of approximately forty jobs and a large portion of whatever remains of a $2 million private placement that it recently completed. (*See* Simmel Aff. ¶ 46, Docket No. 13; Def.'s Opp. to Motion for Preliminary Injunction at 18, Docket No. 12.)

■ GBIC has also failed to demonstrate a likelihood of success concerning its claims under Section 43(a). Here, the problem is not that GBIC failed to make a prima facie showing either that InUnity is representing to customers that Digital Direct and Digital Prospectus embody proprietary InUnity technology or that GBIC in fact developed and owns that technology. Rather, the problem is that GBIC, with full knowledge of InUnity's marketing strategy and of its rationale and implications for GBIC, acquiesced in that strategy. Indeed, it did much more than acquiesce; in exchange for a customization fee of $2,000, it actively assisted InUnity in a manner that was indispensable to the implementation of that strategy. It is therefore unlikely, when the merits of this case are decided, that GBIC will be heard to complain that InUnity wrongfully siphoned off some of the goodwill associated with GBook.

## III. *CONCLUSION AND ORDER*

For all the foregoing reasons, GBIC's motion (Docket No. 4) is **DENIED.**